UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------
HONG YIN,

                         Plaintiff,                    **MEMORANDUM AND ORDER**
                                                       **12-CV-1499 (DRH)(AKT)**

              -against-

NORTH SHORE LIJ HEALTH SYSTEM,

                         Defendant.

------------------------------------------------------X

**APPEARANCES:**

**For the Plaintiff:**
**LAW OFFICE OF JONATHAN BELL**
30 Jericho Executive Plaza #100e
Jericho, NY 11753
By:     Jonathan Bell, Esq.

**For the Defendant:**
**NIXON PEABODY LLP**
50 Jericho Quadrangle
Suite 300
Jericho, NY 11753
By:     Christopher G. Gegwich, Esq.
        Alexander Elliott Gallin, Esq.

**HURLEY, Senior District Judge:**

         Plaintiff Hong Yin ("plaintiff") commenced this action against defendant North Shore

Long Island Jewish Health System ("defendant") asserting claims of "discrimination and

retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e) et

seq. ("Title VII") and The Americans with Disabilities Act Amendment Act ("ADAAA")."

(Complaint at I.)  Initially, defendant moved to dismiss these claims, however, plaintiff "agree[d]

to withdraw" the claims in her original Complaint, conceding that "upon reviewing Defendant's

motion to dismiss, [she] realized that she might benefit from addressing alleged deficiencies

pointed out in Defendant's motion and that the initial Complaint could benefit from significant revision." (Pl.'s Mem. in Opp'n to Def.'s Mot. to Dismiss and in Supp. of Mot. to Amend ("Pl.'s Mem. in Opp'n") at 1, 8.) Plaintiff, although she does not oppose the dismissal of her original complaint, seeks leave to file an amended complaint. Towards that end, she submits a proposed First Amended Complaint ("FAC"), claiming that it "cures any alleged deficiencies discussed in Defendant's motion to dismiss." (*Id.* at 2.) Plaintiff's FAC does not assert any claims pursuant to Title VII, and it contains "additional material facts" and additional claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102 *et seq.*, and the New York State Human Rights Law ("NYSHRL"), New York Executive Law § 290 *et seq.* (*Id.*) Specifically, plaintiff claims that: (1) she was discriminated against because she was disabled and because defendant perceived her to be disabled; (2) defendant failed to reasonably accommodate her disability; (3) defendant retaliated against her; and (4) defendant subjected her to a hostile work environment.

Given plaintiff's withdrawal of her original complaint, defendant's motion to dismiss her original complaint claims is moot. The remaining question before the Court is whether plaintiff should be given leave to file her FAC. For the reasons set forth below, plaintiff's motion to file an amended complaint is denied.

## BACKGROUND

Plaintiff began employment as a physician in defendant's obstetrics and gynecology residency program at Long Island Jewish Medical Center[1] ("LIJMC") on July 1, 2010. (FAC ¶ 9.) During plaintiff's employment, Adiel Fleischer, M.D. ("Dr. Fleischer") was the Chairman of

---

[1] LIJMC "is a full-service academic medical center and a member institution of North Shore Long Island Jewish Health System ("North Shore-LIJ"). (Def.'s Mem. in Supp. of Mot. to Dismiss ("Def.'s Mem. in Supp.") at 1.)

the OB/GYN Department at LIJMC and Leah A. Kaufman, M.D. ("Dr. Kaufman") was the Director of the OB/GYN Residency Program. (*Id*.).

At the age of fifteen, plaintiff was diagnosed with major depressive disorder and anxiety disorder, which she managed through behavioral therapy and pharmacotherapy. (*Id*. ¶ 12.) Additionally, during her time in defendant's residency program, plaintiff's psychiatrist diagnosed her with Post Traumatic Stress Disorder ("PTSD"). (*Id*. ¶13.) Throughout her residency, plaintiff regularly saw her psychiatrist. (*Id*. ¶ 14.)

From July 1, 2010 to August 28, 2010, plaintiff worked nights in Obstetric Service. (*Id*. ¶ 16.) During this time, plaintiff received praise from various doctors for her performance. (*Id*.) According to plaintiff, "[t]here were a few incidents during this period when [she] briefly cried," and "[a]fter one of [those] instances a nurse practitioner insisted that Plaintiff go home."[2] (*Id*.) From August 30, 2010 to September 24, 2010, plaintiff worked in Emergency Department Service. (*Id*. ¶17.) During this time, the attending physicians were satisfied with plaintiff's performance and praised her. (*Id*.) From September 26, 2010 through October 23, 2010, plaintiff worked in Gynecology Service. (*Id*. ¶ 18.) There, plaintiff's performance continued to be satisfactory, although she received some criticism for her "tone." (*Id*.) From October 24, 2010 to December 25, 2010, plaintiff worked days in Obstetric Service. (*Id*. ¶ 19.) Plaintiff's performance during this period remained satisfactory, and she received additional positive feedback. (*Id*.) During this rotation, however, Dr. Kaufman "acknowledged that Plaintiff was unhappy and asked if Plaintiff was receiving appropriate emotional support," to which plaintiff responded that she was. (*Id*.) From December 26, 2010 to January 21, 2011, plaintiff served in Medical ICU, and her performance continued to be satisfactory. (*Id*. ¶ 20.)

---

[2] Plaintiff does not elaborate on the circumstances surrounding these crying episodes.

In January of 2011, plaintiff's psychiatrist prescribed her Klonopin to treat her anxiety. (*Id*. ¶ 22.) Around this time, plaintiff met with Dr. Kaufman for her semi-annual review, during which Kaufman inquired about her emotional status and stated that she felt plaintiff's ratings were influenced by people's perceptions of plaintiff as being depressed. (*Id*. ¶ 23). Between January 24, 2011 and March 21, 2011, Kaufman inquired about plaintiff's emotional status on multiple occasions. (*Id*. ¶ 24.) On January 31, 2011, plaintiff disclosed to Kaufman that she "suffered from mental illness and was under the care of a psychiatrist for appropriate management." (*Id*.) Plaintiff asserts that after she disclosed her depression to Kaufman, she was scrutinized at a higher level than her classmates and received more negative feedback than she had prior to disclosing her disability. (*Id*. ¶¶ 25, 27.) Plaintiff also asserts that other residents were treated with more leniency, specifically a resident who was only given a "light warning" for her repeated tardiness while plaintiff was "often berated for her perceived or alleged deficiencies." (*Id*. ¶ 28.)

From January 24, 2010 to February 18, 2011, plaintiff worked in the Antenatal Testing Unit in the mornings, in the Medicine Clinic in the afternoons, and in the Obstetric Service on the weekends. (*Id*. ¶ 29.) During this time, plaintiff maintains that her work was satisfactory, but she mentions "two incidents [that] occurred in February for which [she] received negative feedback." (*Id*.) Although plaintiff does not provide any circumstances surrounding these instances, she claims that the "two incidents were discriminatorily held against [her] and given undue weight, despite the fact that [she] had improved her performance." (*Id*.)

From February 21, 2011 to March 21, 2011, plaintiff worked in Gynecology Service. During this time, plaintiff asserts that she was "subjected to incessant and unjustifiable criticism by Dr. Kaufman." (*Id*. ¶ 30.) Examples of this treatment included Dr. Kaufman characterizing

an educational question plaintiff asked Dr. Katz, another of plaintiff's supervisors, as inappropriate despite Dr. Katz's opinion to the contrary, Dr. Kaufman's criticism of plaintiff's performance on a surgical case, Dr. Kaufman calling plaintiff into her office to "chastise and harass her" and tell plaintiff her "performance ha[d] deteriorated to a level that [was] unacceptable," and Dr. Kaufman's "demand[] that Plaintiff see her psychiatrist more regularly." (*Id*.) During this time, Dr. Kaufman assigned plaintiff a new mentor, Dr. Leong, whom plaintiff first met with on February 25, 2011. (*Id*.) Dr. Leong told plaintiff that "her contract would not be renewed" and that "this [was her] last chance." (*Id*.) Dr. Leong also told plaintiff that "she [could] not expect 'coddling' like [she] had received in the Midwest" and that "she had to face the culture here in New York." Dr. Leong also told plaintiff that she was "too emotional," that "some people are just not strong enough for this profession," that she "needed to have a 'type A personality' like her or Dr. Kaufman in order to survive," and told plaintiff "to get it through her head that this was not a luxurious setting and that even eating was a luxury." (*Id*.)

On March 3, 2011, plaintiff contacted Dr. Kaufman to inquire about her progress, and Dr. Kaufman responded that plaintiff's performance was "absolutely inappropriate," however "refused to provide any current examples" of her poor performance. (*Id*.) Around this time, plaintiff requested written feedback from other attending physicians, but Dr. Kaufman disapproved of this behavior and told another employee to tell plaintiff to stop requesting these evaluations. (*Id*.) Additionally, Dr. Kaufman "expressed concern about Plaintiff attending her psychiatric appointments," and plaintiff responded by having her psychiatrist email Dr. Kaufman to confirm that plaintiff "should be able to function at work and that [she] was meeting with her psychiatrist regularly." (*Id*.)

On March 16, 2011, after all other residents had been offered employment contract renewals, plaintiff approached Dr. Kaufman to inquire about her contract status. (*Id*.) Dr. Kaufman refused to speak to plaintiff at length and stated that plaintiff "would most likely get the contract for renewal the following week." (*Id*.) Following this meeting, Dr. Leong encouraged plaintiff to meet with her. (*Id*.) During their meeting, Dr. Leong stated that plaintiff "was too emotional," could not expect any "coddling," and had acquired a reputation as "the resident that cries." Dr. Leong mentioned that people had a tendency to blame plaintiff when something went wrong, "even when it was not her fault," comparing plaintiff to a criminal who gets out of jail and has to persuade others "that he turned his life around."

On March 21, 2011, Dr. Kaufman gave plaintiff a letter stating that her performance was unacceptable and indicating that she would be placed in a remediation program. (*Id*. ¶ 32.) Dr. Kaufman was "unreceptive" to plaintiff's attempt to discuss the letter. (*Id*.) During her meeting with Dr. Kaufman plaintiff "felt frozen, felt intense fear, and tried not to fall apart" and became "extremely sad" and "cried uncontrollably" after the meeting. (*Id*.) Dr. Katz drove the plaintiff home, and plaintiff "commenced medical leave that same day."[3] (*Id*. ¶¶ 32-33.)

During the week of March 27, 2011, when Dr. Kaufman was on vacation, plaintiff requested evaluations from multiple attending physicians, and these evaluations "ranged from satisfactory to excellent." (*Id*. ¶ 34.) Additionally, plaintiff met with Dr. Katz at the end of March, and Dr. Katz "opined that the claims in Kaufman's March 21, 2011 letter were misrepresentative." (*Id*. ¶ 35.) When Dr. Kaufman returned from vacation approximately two weeks later, doctors were hesitant to provide plaintiff with evaluations." (*Id*. ¶ 37.)

---

[3] It is unclear from the FAC when plaintiff's medical leave ended.

On or around April 1, 2011, plaintiff met with Dr. Fleischer to request an investigation to "clarify her academic status and performance evaluation," and she asked that "senior residents be interviewed about her performance, as they spent the most time with Plaintiff." (*Id.* ¶ 36.) At this meeting, plaintiff complained of the "inappropriate way that she was being treated, including the way she was being treated by Dr. Kaufman, and the discrepancy between Kaufman's March 21, 2011 letter and the evaluations that Plaintiff had obtained." (*Id.*)

On April 8, 2011, plaintiff spoke with Dr. Fleischer to inquire about the status of the investigation that she had requested. (*Id.* ¶ 39.) Although Dr. Fleischer "acknowledged the discrepancy" between plaintiff's evaluations and Dr. Kaufman's letter, Dr. Fleischer suggested that plaintiff remain in remediation and informed her that no investigation had been conducted. (*Id.*) At this meeting, plaintiff "stated that she could not trust the facility or remain in the program and felt that she had no choice but to resign." (*Id.* ¶ 40.) Following plaintiff's meeting with Dr. Fleischer, Dr. Kaufman asked plaintiff to sign a formal resignation letter, "verbally attacked [her], suggesting that Plaintiff was inconsiderate." (*Id.* ¶ 41.) Following this conversation, plaintiff was contacted by an employee that "told Plaintiff that Kaufman had instructed her to contact Plaintiff about signing a resignation letter." (*Id.* ¶ 42.)

On May 2, 2011, plaintiff states that she "explicitly complained about and/or opposed the discriminatory practices of Defendant," yet does not elaborate regarding the method of her stated opposition or give any details about what she stated in her complaint. (*Id.* ¶ 45.) After leaving the defendant's residency program,[4] in July 2012, plaintiff began a new residency program and has been doing "extremely well." (*Id.* ¶ 49.) As such, plaintiff is not seeking reinstatement into the defendant's residency program. (*Id.* ¶ 1.)

---

[4] It is unclear from the FAC whether plaintiff's employment relationship with LIJMC ended due to her resignation or defendant's refusal to renew her contract.

**DISCUSSION**

**I. *Motion to Amend Standard***

Federal Rule of Civil Procedure ("Rule") 15(a)(2) states that "[t]he court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P 15(a)(2). An "[o]utright refusal to grant the leave without any justifying reason for the denial is an abuse of discretion." *Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 101 (2d Cir. 2002); See *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). A motion to amend a complaint may be denied, however, if the amendment would be futile. See *Foman v. Davis*, 371 U.S. 178, 182 (1962) (outlining factors to consider when determining a motion seeking leave to amend a complaint, including undue delay, bad faith, dilatory motive, repeated failure to remedy deficiencies in the complaint, undue prejudice to the defendant, or futility). "A proposed amendment to a pleading is deemed to be futile if the amended pleading fails to state a claim or would be subject to a successful motion to dismiss on some other basis." *Kirk v. Heppt*, 423 F. Supp. 2d 147, 149 (2d Cir. 2006) (citing *Oneida Indian Nation of New York v. City of Sherrill*, 337 F.3d 139, 168 (2d Cir. 2003).

**II.     *Whether Plaintiff's Amendment Would be Futile***

**A.     Primary Jurisdiction**

According to defendant, plaintiff's amendment would be futile because her "claims are precluded by New York Public Health Law § 2801-b." (Def.'s Mem. in Supp. of Mot. to Dismiss ("Def.'s Mem. in Supp.") at 7.) New York Public Health Law § 2801-b provides:

> 1. It shall be an improper practice for the governing body of a hospital to refuse to act upon an application for staff membership or professional privileges or to deny or withhold from a physician . . . staff membership or professional privileges in a hospital, or to exclude or expel a physician . . . from staff membership in a hospital or curtail, terminate or diminish in any way a physician's . . . professional privileges in a hospital, without stating the reasons therefore, or if the reasons stated are unrelated to standards of

> patient care, patient welfare, the objectives of the institution or the
> character or competency of the applicant.
>
> 2.  Any person claiming to be aggrieved by an improper practice as
> defined in this section may, by himself or his attorney, make, sign
> and file with the public health council [("PHC")] a verified
> complaint in writing which shall state the name and address of the
> hospital whose governing body is alleged to have committed the
> improper practice complained of and which shall set forth the
> particulars thereof and contain such other information as may be
> required by the council.

According to defendant, pursuant to this statute "a physician seeking to challenge the termination of her hospital privileges or separation from a residency program . . . must file a complaint with the PHC and await its review of the complaint," and "[o]nly after the PHC has had the opportunity to review the factual issues of the complaint may a court consider the physician's claims."  (Def.'s Mem. in Supp. at 8.)

Under the doctrine of primary jurisdiction, "[g]enerally, a physician in New York challenging the termination of hospital privileges must first file a complaint with the PHC and may pursue the matter in the courts only after the PHC has had the opportunity to review the factual issues."  *Deshpande v. Medisys Health Network, Inc.*, 2008 WL 2004160, at *2 (E.D.N.Y. May 7, 2008).  Courts in this circuit, however, have recognized two narrow exceptions to this doctrine.  "The first applies where the physician alleges that his or her privileges have been terminated for reasons unrelated to medical care and therefore do not require the particular expertise of the PHC."  *Id.*  "The second applies where the physician seeks damages, but not reinstatement, and where the presence or absence of a proper medical reason for terminating the plaintiff's privileges is not dispositive of the plaintiff's claims."  *Id.*; *Johnson v. Nyack Hosp.*, 964 F.2d 116, 121 (1992) (holding that physician was required to file complaint

with PHC where physician "[could] not prevail on his antitrust claim if defendants had legitimate medical reasons to terminate his surgical privileges").

Although either exception may prevent a plaintiff from having to file a complaint with the PHC, the circumstances of this case clearly fall within the second exception, thus obviating the need to discuss the first exception. Here, plaintiff is not seeking reinstatement. (Pl.'s Mem. in Opp'n at 6.) Furthermore, the presence or absence of a proper medical reason for deciding not to renew plaintiff's contract is not dispositive of plaintiff's claims because even if the defendant had legitimate medical reasons for not renewing the contract, the plaintiff could still succeed on his or her ADA and NYSHRL claims by proving that the proffered legitimate reasons were a pretext for discrimination.[5] *See Chandra v. Beth Israel Med. Ctr.*, 2010 WL 5600373, at *5 (Dec. 2, 2010), *adopted by* 2011 WL 180801 (S.D.N.Y. Jan. 19, 2011) (finding that whether defendants had proper medical reasons for firing plaintiff was not dispositive of plaintiff's discrimination claim because plaintiff "could potentially prevail on his claim even if the hospital had legitimate medical reasons for its actions" by showing that discrimination was a motivating factor in termination); *Hamad v. Nassau Cnty. Med. Ctr.*, 191 F. Supp. 2d 286, 298 (E.D.N.Y. 2000) (finding that doctrine of primary jurisdiction did not apply because "even if PHC finds that defendants had legitimate reason for termination of [plaintiff's] surgical privileges, [plaintiff] may still prevail in this action if he can prove that the proffered reasons were merely pretext for

---

[5] As discussed *infra*, plaintiff's ADA and NYSHRL claims are analyzed according to the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–805 (1973), which requires that a plaintiff must first establish a *prima facie* case of discrimination, and if it does so then the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions; if the employer does so, the burden shifts back to the plaintiff to prove that the legitimate reasons offered by the defendant were a pretext for discrimination.

discrimination"). As a result, the doctrine of primary jurisdiction does not preclude plaintiff's claims and do not render plaintiff's FAC futile.

## B. Administrative Exhaustion

Although the doctrine of primary jurisdiction does not bar plaintiff's claims, the Court also must analyze whether plaintiff's claims under the ADA are precluded because plaintiff failed to exhaust her administrative remedies regarding these claims by filing a complaint with the EEOC. In particular, according to defendant, plaintiff's EEOC charge "did not include any factual allegations or raise any claims concerning perceived or 'regarded as' discrimination, an alleged failure to accommodate or a claim for constructive discharge." (Def.'s Mem. in Opp'n to Pl.'s Mot. to Amend ("Def.'s Mem. in Opp'n") at 4.)

"Title I of the ADA require[s] a plaintiff to exhaust all available administrative remedies prior to commencing an employment discrimination action in federal court." *Manello v. Nationwide Mutual Ins. Co.*, 2012 WL 3861236, at *8 (E.D.N.Y. Sept. 4, 2012). "Claims that were not asserted in an EEOC charge may be pursued in a federal action only if they are 'reasonably related' to those that were filed with the agency." *Id*. at 9. The Second Circuit has stated that "[a] claim is considered reasonably related if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made." *Williams v. New York City Housing Auth.*, 458 F.3d 67, 70 (2d Cir. 2006).

With respect to plaintiff's claim that defendants discriminated against her because they perceived her to be disabled, plaintiff makes no allegations in the EEOC charge related to this claim. In the EEOC charge, plaintiff states that she is disabled due to her "medical history of depression," (Ex. C to Gegwich Aff. ("EEOC charge") ¶ 13), but fails to allege any facts that

defendant regarded her as having a disability or any facts suggesting that she was making such a claim. These facts would have been "particularly relevant because a regarded as claim turns on the employer's perception of the employee, not whether the employee actually has a disability." *See Cadely v. New York City Department of Trans.*, 2008 WL 465199, at *10 (S.D.N.Y. Feb. 16, 2008) (internal citations and quotation marks omitted). As a result, whether defendant perceived plaintiff as disabled would not have fallen within the scope of the investigation resulting from plaintiff's EEOC charge. The EEOC charge is therefore not reasonably related to the claim in plaintiff's complaint alleging discrimination based on a perceived disability. Furthermore, plaintiff's perceived disability claim is precluded and allowing plaintiff to amend her complaint to add this claim would be futile. [6]

### C. Plaintiff's Remaining Claims Fail to State Claims Upon Which Relief Can Be Granted

Defendant argues that allowing plaintiff to file the remaining claims would be futile because each of them fails to state a claim under Rule 12(b)(6). In recent years, the Supreme Court has clarified the pleading standard applicable in evaluating a motion to dismiss under Rule 12(b)(6).

First, in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), the Court disavowed the well-known statement in *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957) that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly*, 550 U.S. at 561. Instead, to survive a motion to dismiss under *Twombly*, a plaintiff must allege "only

---

[6] Although defendant also argues that plaintiff's constructive discharge claim and failure to accommodate claim are precluded because plaintiff did not exhaust her administrative remedies, the Court need not address these arguments here because the Court will address the sufficiency of those claims below.

enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Id.* at 555 (citations and internal quotation marks omitted).

More recently, in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court provided further guidance, setting a two-pronged approach for courts considering a motion to dismiss. First, a court should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id*. at 679. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678 (*citing Twombly*, 550 U.S. at 555).

Second, "[w]hen there are well-pleaded factual allegations a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id*. at 679. "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. The Court defined plausibility as follows:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' "

*Id.* at 678 (quoting and citing Twombly, 550 U.S. at 556–57) (internal citations omitted).

In other words, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* at 679 (quoting FED. R. CIV. P. 8(a)(2)).

Generally, in deciding a motion to dismiss pursuant to Rule 12(b)(6), the court may only consider facts stated in the complaint or "[d]ocuments that are attached to the complaint or incorporated in it by reference." *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir. 2007); *see also Gillingham v. Geico Direct,* 2008 WL 189671, at *2 (E.D.N.Y. Jan.18, 2008). Although defendant has attached materials outside of the FAC to its motion papers, the Court has not considered these extraneous materials in its analysis.

### 1. *Plaintiff's Hostile Work Environment Claims Under the ADA and NYSHRL*

In order to establish a hostile work environment claim under the ADA, a plaintiff must show: 1) that she is a member of a protected class; 2) that she suffered unwelcome harassment; 3) that she was harassed because of her membership in a protected class; and 4) that the harassment was sufficiently severe or pervasive to alter the abusive work environment.[7] *See Scott v. Memorial Sloan-Kettering Cancer Ctr.*, 190 F. Supp. 2d 590, 598 (S.D.N.Y. 2002). "This test has objective and subjective elements: the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." *Alfano v. Costello,* 294 F.3d 365, 374 (2d Cir. 2002) (quoting *Harris v. Forklift Sys., Inc.,* 501 U .S. 17, 21 (1993)); *see also Demoret v. Zegarelli,* 451 F.3d 140, 149 (2d Cir. 2006) ("Plaintiff must show not only that she

---

[7] Though the Second Circuit has not explicitly recognized a hostile work environment claim pursuant to the ADA, many district courts in this circuit have recognized such a claim. *See e.g.*, *Wesley-Dickson v. Warwick Valley Cent. School Dist.*, 2013 WL 5338516, at *15 (S.D.N.Y. Sept. 24, 2013); *Forgione v. City of New York*, 2012 WL 4049832, at *7, n.6 (E.D.N.Y. Sept. 13, 2012).

subjectively perceived the environment to be abusive, but also that the environment was objectively hostile and abusive.").

"Isolated incidents typically do not rise to the level of a hostile work environment unless they are 'of sufficient severity' to 'alter the terms and conditions of employment as to create such an environment.' " *Demoret,* 451 F.3d at 149 (quoting *Patterson v. Cnty. of Oneida,* 375 F.3d 206, 227 (2d Cir. 2004)).  However, "[t]here is no fixed number of incidents that a plaintiff must endure in order to establish a hostile work environment," and instead, courts are to "view the circumstances in their totality, examining the nature, severity, and frequency of the conduct." *Alfano,* 294 F.3d at 379.  It is necessary for the plaintiff to establish a link between the actions by defendants and plaintiff's membership in a protected class.  *Id.* at 374; *Brown v. Henderson,* 257 F.3d 246, 252 (2d Cir. 2001).

Defendant argues that plaintiff's FAC fails to state a plausible hostile work environment claim because "plaintiff's allegations are neither severe nor pervasive."  (Def.'s Mem. in Opp'n at 6.)  The Court agrees.  First of all, many of plaintiff's allegations, for example, that she was generally "harass[ed] and berate[d]" (FAC ¶ 30e) and that "two incidents [in February] were discriminatorily held against [her] unfairly and given undue weight," (FAC ¶ 29b), without more detail, are too vague and conclusory to support a claim.  *Argeropoulos v. Exide Techs.*, 2009 WL 2132443, at *6 (E.D.N.Y. Ju. 8, 2009) ("[The Court need not accept as true Plaintiff's conclusory and entirely non-specific allegation[s].").  Moreover, plaintiff alleges only three specific occasions where her supervising doctors made arguably negative comments to her regarding her disability.  The first incident occurred on or around February 24, 2011 when Dr. Kaufman told plaintiff that her performance was unacceptable and "demanded that Plaintiff see her psychiatrist more regularly."  The other incidents occurred during plaintiff's two meetings with Dr. Leong

where Dr. Leong told plaintiff that she was "too emotional," could not expect "coddling," and that she was developing a reputation as "the resident who cries." (FAC ¶ 30.) These incidents, however, are too isolated and minor to warrant relief under a hostile environment theory. *See Forgione v. City of New York*, 2012 WL 4049832, at *7 (E.D.N.Y. Sept. 13, 2012) (dismissing hostile work environment claim where defendant "made several offensive quips to [plaintiff] about his perceived disability and told [plaintiff] he needed to see a psychiatrist").

Furthermore, plaintiff's allegations that after she disclosed her disability she "was scrutinized at a higher level than her classmates," (FAC ¶ 25), that she was given negative feedback, and that Dr. Kaufman was "overly critical" of her, (FAC ¶¶ 27, 30b), are not only vague, but insufficient as a matter of law to support a hostile work environment claim. *Salerno v. Town of Bedford, NY*, 2008 WL 5101185, at *8 (S.D.N.Y. Dec. 3, 2008) ("Allegations of negative job evaluations or excessive reprimands are insufficient to establish a hostile environment claim."). Finally, any contact Dr. Kaufman had with plaintiff about signing her resignation letter came after plaintiff had expressed her desire to resign and cannot be considered hostile. (FAC ¶¶ 40-42.) In conclusion, the allegations in plaintiff's complaint, viewed in their totality, do not state a plausible hostile work environment claim. Since NYSHRL hostile work environment claims are governed by the same standard as federal claims, plaintiff's state claim also fails. *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006). As a result, allowing plaintiff to amend her complaint to add federal and state hostile work environment claims would be futile.

### 2. *Plaintiff's Discrimination Claims Under the ADA and NYSHRL*

The ADA prohibits employment discrimination by a "covered entity ... against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). Employment discrimination claims under the ADA are evaluated under the now familiar burden-shifting analysis set forth in

*McDonnell-Douglas Corp. v. Green,* 411 U.S. 792, 802–805 (1973). Under *McDonnell–Douglas* and its innumerable progeny, (1) a plaintiff must first establish a *prima facie* case of discrimination; (2) the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions; if the employer does so, the *McDonnell–Douglas* framework and its presumptions and burdens disappear, leaving the sole remaining issue of "discrimination vel non;" and thus, (3) the burden shifts back to the plaintiff "to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143 (2000) (internal quotation marks and citations omitted). "For a disability discrimination claim under the ADA, a plaintiff must demonstrate that her disability was at least 'a motivating factor' for the adverse employment action."[8] *See Wesley-Dickson v. Warwick Valley Cent. School Dist.*, 2013 WL 5338516 (S.D.N.Y. 2013) (citing *Parker v. Columbia Pictures Indus.,* 204 F.3d 326, 336–37 (2d Cir. 2000)). Although intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.*

In order to establish a *prima facie* case of discrimination under the ADA, a plaintiff must show that: (1) his employer is subject to the ADA; (2) the plaintiff was disabled within the

___

[8] In *Gross v. FBL Fin. Servs. Inc.*, 557 U.S. 167, 176 (2009), the Supreme Court held that in order to withstand summary judgment, a plaintiff claiming a violation under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*, must raise a triable issue that age was the "but for" reason for the adverse employment action. Despite the similarities in language between the ADEA and the ADA, the defendant does not argue that the heightened standard applies here. The Court declines to *sua sponte* pursue that issue – as yet undecided by the Second Circuit, s*ee Najjar v. Mirecki*, 2013 WL 3306777, at *7 (S.D.N.Y. July 2, 2013) – because its application would not affect the viability of plaintiff's proposed FAC.

meaning of the ADA; (3) the plaintiff was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) the plaintiff suffered [an] adverse employment action because of his disability. *See Jacques v. DiMarzio, Inc.,* 386 F.3d 192, 198 (2d Cir. 2004) (citing *Cameron v. Cmty Aid for Retarded Children, Inc.,* 335 F.3d 60, 63 (2d Cir. 2003)); *Shannon v. New York City Transit Auth.,* 332 F.3d 95, 99 (2d Cir. 2003).

"For the most part, the ADA and the NYSHRL are construed similarly, and the clear legislative purpose in drafting the NYSHRL was 'to enact a definition of disability coextensive with comparable federal statutes." ' [9] *Burton v. Metro. Transp. Auth.,* 244 F. Supp . 2d 252, 257 (S.D.N.Y. 2003) (quoting *Reeves v. Johnson Controls World Servs.,* Inc., 140 F.3d 144, 155 (2d Cir. 1998), *superseded by statute on other grounds as stated in Hilton v. Wright,* 673 F.3d 120 (2d Cir. 2012)). Moreover, claims brought under the NYSHRL are analyzed under the same *McDonnell Douglas* burden-shifting framework as ADA claims. *See Weinstock v. Columbia Univ.,* 224 F. 3d 33, 42 n. 1 (2d Cir. 2000).

Here, defendant challenges the sufficiency of plaintiff's allegations that she suffered adverse action. According to plaintiff, "[t]he adverse actions committed by Defendant include (1) unjustifiably placing her in a remediation program, thereby significantly diminishing her material responsibilities and subjecting her to humiliation in front of her peers; (2) unnecessarily assigning her a second mentor who discriminated against her and harassed her based on her disability; (3) failing to investigate her discrimination claims even though Plaintiff complained and requested an investigation, (4) attempting to prevent Plaintiff from obtaining objective evaluations and causing discriminatory and inaccurate evaluations and comments to be made

---

[9] Although "the definition of a disability under New York law is not coterminous with the ADA definition," that difference is not of importance to this decision. *Giordano v. City of N.Y.*, 274 F.3d 740, 754 (2d Cir. 2001) (citing, *inter alia*, *State Div. of Human Rights v. Xerox Corp.*, 65 N.Y.2d 213 (1985)).

concerning Plaintiff, and (5) creating an environment so toxic, prejudicial and hostile to Plaintiff that it amounted to her constructive discharge." (Pl.'s Mem. in Opp'n. at 11-12 (internal quotation marks and citations omitted).) Plaintiff also asserts that her "contract renewal was unduly delayed." (Pl.'s Reply at 7.) Defendant responds that "[n]one of the circumstances identified by Plaintiff constitutes an adverse employment action and, as such, her claims should be considered futile." (Def.'s Mem. in Opp'n at 11.)

The Supreme Court has stated that in order to be actionable under federal discrimination laws, an adverse employment action must be "tangible" or "material." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761; 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998); *see also Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006) ("A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment.") (citation and internal quotation marks omitted). "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761. Materially adverse employment actions also include "a demotion evidenced by a decrease in wage or salary, a less distinguished title, . . . or other indices . . . unique to a particular situation." *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004) (citations and internal quotations omitted). However, a "bruised ego," a "demotion without change in pay, benefits, duties, or prestige," or "reassignment to [a] more inconvenient job" are all insufficient to constitute a tangible or material adverse employment action. *Ellerth*, 524 U.S. at 761 (internal quotations and citations omitted).

First, regarding plaintiff's remediation program, plaintiff alleges only that her placement in the program was "an adverse action that was unwarranted and discriminatory." (FAC ¶ 32.)

Plaintiff does not allege any facts from which one could infer that her placement in the program created a materially adverse change in her working conditions. Similarly, plaintiff does not allege any facts suggesting that assigning her to a new mentor, Dr. Leong materially altered the terms of her employment. Moreover, plaintiff's allegations that defendant prevented her from obtaining evaluations and evaluated her inaccurately do not rise to the level of adverse action. *Weeks v. New York State (Div. of Parole)*, 273 F.3d 76, 86 (2d Cir. 2001) *abrogated on other grounds* ("It hardly needs saying that a criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action."); *See Browne v. City Univ. of New York*, 419 F. Supp. 2d 315, 332 (E.D.N.Y. 2005) *aff'd by* 202 Fed. App'x 523 (2d Cir. 2006) ("A negative evaluation alone, absent some accompanying adverse result such as a demotion, diminution of wages, or other tangible loss, does not constitute an adverse employment action."); *Hall v. New York City Dep't of Trans.*, 701 F. Supp. 2d 318, 335-36 (E.D.N.Y. 2010) (denying claim because plaintiff failed to establish that she suffered any adverse employment action as a result of alleged increased scrutiny) (collecting cases).

In addition, the FAC does not sufficiently allege that plaintiff suffered an adverse action because defendant engaged in undue delay in renewing her contract. Although plaintiff alleges that by March 16, 2011, she was the only resident who had not been offered a contract renewal, she also alleges that on that date, Dr. Kaufman told plaintiff that she "would most likely get the contract for renewal the following week." (FAC ¶ 30j.) Following that encounter, defendant placed plaintiff in a remediation program where she seems to have remained until she expressed her desire to resign on April 8, 2011. (FAC ¶¶ 39-40.) It can be inferred from the complaint that plaintiff herself decided to terminate her employment relationship with defendant and resigned.

(FAC ¶ 40 ("Plaintiff stated that she could not trust the facility or remain in the program and felt that she had no choice but to resign"); ¶ 47 (Plaintiff's conversation with another resident "confirmed Plaintiff's view that [she] could not return to the program.").)  These facts alone do not support an inference that defendant's conduct materially altered the terms of plaintiff's employment.

Furthermore, as defendant correctly states, an employer's failure to investigate discrimination claims is not an adverse employment action.  *Price v. Cushman & Wakefield, Inc.* 808 F. Supp. 2d 670, 690 (S.D.N.Y. 2011); *Hayes v. Kerik*, 414 F. Supp. 2d 193, 203 (E.D.N.Y. 2006); *cf. Fincher v. Depository Trust and Clearing Corp.*, 604 F.3d 712, 721 (2d Cir. 2010) (holding that in retaliation context "an employer's failure to investigate a complaint of discrimination cannot be considered an adverse employment action taken in retaliation for the filing of the same discrimination complaint").

Finally, as the Court has already found that plaintiff has not sufficiently alleged a hostile work environment claim, her constructive discharge claim must fail.  *See Zick v. Waterfront Comm. of New York Harbor*, 2012 WL 4785703, at *7 (S.D.N.Y. Oct. 4, 2012) ("Constructive discharge is a subset of 'hostile work environment.'  Conditions that do not qualify as a hostile work environment under Title VII are, by definition, not sufficiently intolerable to force an employee to quit.")  As a result, plaintiff's FAC fails to state disability discrimination claims under both the ADA and NYSHRL[10], and allowing plaintiff to amend her complaint to add these claims would be futile.

### 3. *Plaintiff's Retaliation Claims Under the ADA and NYSHRL*

---

[10] This includes plaintiff's claims under the NYSHRL that she was discriminated against because she was disabled and because of defendant's perception that she was disabled.

The ADA makes it unlawful for an employer to "discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the [ADA]." 42 U.S.C. § 12203(a). Retaliation claims under the ADA and the NYSHRL are analyzed under the same *McDonnell Douglas* burden-shifting framework as discrimination claims. *Tse v. New York Univ.*, 2013 WL 5288848, at *16 (S.D.N.Y. Sept. 19, 2013). In order to state a claim for retaliation under the ADA, a plaintiff must plead: (i) plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action. *Weixel v. Bd. of Educ. of City of New York,* 287 F.3d 138, 148-49 (2d Cir. 2002).

*Protected Activity*

A plaintiff may establish that she engaged in protected activity under the ADA by pleading that she engaged in "informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry, and expressing support of co-workers who have filed formal charges." *Correa v. Mana Prods. Inc.*, 550 F. Supp. 2d 319, 327 (E.D.N.Y. 2008) (citing *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990). "However, such informal complaints must be sufficiently specific to make it clear that the employee is complaining about conduct prohibited by [federal anti-discrimination law]. *Risco v. McHugh*, 868 F. Supp. 2d 75, 110 (S.D.N.Y. 2012).

Here, plaintiff claims that she engaged in protected activity when "(1) After Plaintiff commenced medical leave on March 21, 2011, she opposed the discrimination, harassment, and

creation of a hostile work environment by complaining of her unfair treatment to Dr. Fleischer, who presumably knew of Plaintiff's disability or perceived her to be disabled, (2) Shortly after March 21, 2011, Plaintiff opposed the discrimination, harassment, and creation of a hostile work environment by attempting to obtain objective evaluations from people she had worked with at Defendant's facilities; (3) Plaintiff also opposed the discrimination, harassment, and creation of a hostile work environment by asking Dr. Fleischer for an investigation regarding her performance and the inappropriate way that she was being treated; and (4) On May 2, 2011, Plaintiff explicitly complained about and/or voiced opposition to the Defendant's discriminatory practices to Defendant, including Dr. Kaufman and Dr. Fleischer." (Pl.'s Mem. in Opp'n at 13.)

According to defendant, "Plaintiff does not plausibly allege that she engaged in protected activity prior to May 2, 2011." (Def.'s Mem. in Opp'n at 21.) The Court agrees with defendant that plaintiff's allegations that she engaged in protected activity when she attempted to obtain evaluations from co-workers are insufficient because plaintiff does not allege how these incidents constituted any opposition to discriminatory practices. Moreover, it is not clear from plaintiff's allegation that when she met with Dr. Fleischer on April 1, 2011 "regarding the inappropriate way that she was being treated," (FAC ¶ 36), she complained about being discriminated against because of her disability, and as such that allegation does not suffice. *Mayling Tu v. OppenheimerFunds, Inc.*, 2012 WL 516837, at * 10 (S.D.N.Y. Feb. 16, 2012) ("While an informal complaint to management may be protected activity, the plaintiff offers no evidence that she communicated a belief that [defendant] was discriminating against her. Absent such evidence, plaintiff's [complaints] do not support a retaliation claim.") (internal citations omitted).

Plaintiff alleges that on "May 2, 2011, [she] explicitly complained about and/or opposed the discriminatory practices of Defendant discussed at length in this Complaint." (FAC ¶ 45.) Even assuming that this vague allegation is a sufficient pleading of protected activity, plaintiff does not plead a causal connection between this complaint and any adverse actions because as defendant states, any "alleged retaliation occurred prior to her protected activity." (Def.'s Mem. in Opp'n at 24.) Plaintiff does not allege any facts occurring after May 2, 2011 that could plausibly amount to adverse action. In particular, plaintiff's claim that defendant "attempted to prevent Plaintiff from obtaining objective evaluations and caused discriminatory and inaccurate evaluations and comments to be made concerning Plaintiff" concern incidents that plaintiff alleges occurred in February and March (FAC ¶ 31i) and early April of 2011 (FAC ¶ 37). In addition, as stated above, defendant's failure to investigate a discrimination complaint does not amount to retaliation based on that same complaint. *Fincher*, 604 F.3d at 721 ("an employer's failure to investigate a complaint of discrimination cannot be considered an adverse employment action taken in retaliation for the filing of the same discrimination complaint"). Furthermore, plaintiff's allegation that defendant "intensely pressured her to resign and created an environment so toxic, prejudicial and hostile to Plaintiff that it amounted to her constructive discharge shortly after the May 2, 2011 complaint" (FAC ¶¶ 73, 105) is insufficient as plaintiff alleges absolutely no facts after May 2, 2011 supporting her allegation that defendant created an environment so hostile it forced her to resign. As a result, plaintiff's state and federal retaliation claims would be futile because they do not withstand a 12(b)(6) motion to dismiss.

**4.** ***Plaintiff's Failure to Accommodate Claims Under the ADA and NYSHRL***

In order to plead a plausible claim of a disability discrimination based on a failure to accommodate, a plaintiff must allege facts showing that (1) the employer is subject to the ADA,

(2) she is disabled within the meaning of the ADA, (3) she could perform the essential functions of the job with or without reasonable accommodation, and (4) the employer had notice of the disability and failed to provide such accommodation. *Lyons v. Legal Aid Soc.*, 68 F.3d 1512, 1515 (2d Cir. 1995). "Aside from the broader scope of covered disabilities under New York Executive Law § 296, [a plaintiff's] state law reasonable accommodation claim is governed by the same legal standards as federal ADA claims." *Timmel v. West Valley Nuclear Services Co.*, 2011 WL 5597350, at *11 (W.D.N.Y. Nov. 17, 2011) (internal citations and quotation marks omitted).

Under the fourth prong, it is the employee's responsibility not only to notify the employer about the alleged disability, but also to "demonstrate to an employer that she needs an accommodation for reasons related to a medical condition disability." *MacEntee v. IBM*, 783 F. Supp. 2d 434, 443-44 (S.D.N.Y. 2011) (holding that plaintiff's informing her manager that she was depressed did not provide sufficient notice, or demonstrate a request for an accommodation that IBM refused, under the ADA "because she in no way inferred that her depression required any accommodations"). Here, plaintiff alleged that she "disclosed to Dr. Kaufman that she suffered from mental illness and was under the care of a psychiatrist for appropriate management," but fails to allege that she requested any accommodation from defendant at any point. (FAC ¶ 24b.) Although she claims that "Defendant should have offered [her] a reasonable accommodation if it believed Plaintiff's disability to be interfering with her performance," plaintiff has not alleged any facts stating that she disclosed the limitations of her depression or requested any accommodations. (*Id*. ¶ 26.) As a result, she has not adequately alleged a reasonable accommodation claim. *See MacEntee*, 783 F. Supp. 2d at 444 ("[U]nlike disabilities that are visible to an employer, the presence, duration and ever-varying severity of

depression cannot be adequately perceived or accommodated unless an employee informs in some manner her employer of her limitations as a result of such disability.").  As a result, plaintiff's FAC fails to state a claim for a reasonable accommodation.

## CONCLUSION

As mentioned above, plaintiff has withdrawn her original complaint.  As a result, defendant's motion to dismiss that complaint is denied as moot.  In addition, for the foregoing reasons, plaintiff's filing the FAC would be futile and her motion to amend is denied.  The clerk of the Court is directed to close this case.

**SO ORDERED.**

Dated: Central Islip, New York
        May 19, 2014                                       _____/s/_____
                                                           Denis R. Hurley
                                                           United States District Judge